IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| SAV-RX PRESCRIPTION SERVICES, INC., a Nebraska corporation, | |
| Plaintiff, | 4:23-CV-3232 |
| vs. | MEMORANDUM AND ORDER |
| DRUGSITE LIMITED, a New Zealand limited liability company; and DRUGSITE LIMITED, as Trustee of the Drugsite Trust; | |
| Defendants. | |

This matter is before the Court on the plaintiff's motion for a temporary restraining order. The Court will deny the plaintiff's request for *ex parte* relief, but will set a hearing on the plaintiff's motion for a preliminary injunction.

## I. BACKGROUND

The plaintiff, "Sav-Rx Prescription Services," is a Nebraska corporation that offers free "cash discount cards" to consumers, which allows them to pay for prescription drugs at a lower rate negotiated by the plaintiff with pharmacies and drug manufacturers. Filing 1 at 3, 5. In 1994, the plaintiff registered the service mark "SAV-RX" to market its business. Filing 1 at 3; filing 1-2. And, the plaintiff alleges, it has used that mark in commerce continuously since then. Filing 1 at 4. The plaintiff's program comprises, it says, "a network of more than 72,000 pharmacies, including major chains, across the country." Filing 1 at 5.

According to the plaintiff, the defendant "Drugsite Limited" runs an effectively identical savings program under the name "SaveRx." Filing 1 at 5. The plaintiff says that program "is available at over 70,000 pharmacies across the United States, Puerto Rico, Guam, and the Virgin Islands, including major chains such as CVS, Walmart, and Walgreens." Filing 1 at 6.

The plaintiff sent the defendant a cease-and-desist letter dated October 10, 2023, demanding that the defendant stop using the "SaveRx" mark. Filing 6-3. The plaintiff's counsel has received no response. Filing 6-1 at 2. The plaintiff now moves the Court for an *ex parte* temporary restraining order which would, generally described, proscribe the defendant from referring to its program as "SaveRx." *See* filing 4 at 2-4.

## II. DISCUSSION

In determining whether to grant a temporary restraining order, the Court must consider the factors set forth in *Dataphase Systems, Inc. v. C.L. Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). Those factors include: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Id.* at 114. No single factor is dispositive, and the burden is on the movant to establish the propriety of the remedy. *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994).

And while a temporary restraining order and preliminary injunction are weighed by the same substantive standards, there are additional procedural requirements for a temporary restraining order, which is an emergency measure meant to provide immediate relief until the adverse party can be heard in opposition on a motion for preliminary injunction. *See* Fed. R. Civ. P. 65(b). Specifically, the Court may issue a temporary restraining order—that

is, an *ex parte* order without written or oral notice to the adverse party or its attorney—only if:

>(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; *and*
>
>(B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Rule 65(b)(1). The Court will address the *Dataphase* factors first, and then explain why the Court finds *ex parte* relief unwarranted.

### 1. LIKELIHOOD OF SUCCESS ON THE MERITS

In deciding whether to grant a temporary restraining order, likelihood of success on the merits is the most significant factor. *Laclede Gas Co. v. St. Charles Cty.*, 713 F.3d 413, 419-20 (8th Cir. 2013). Absence of a likelihood of success on the merits would strongly suggest that preliminary injunctive relief should be denied. *See Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013).

The plaintiff's claims here include several state law statutory and common law claims, but its motion for injunctive relief is focused on mark infringement and unfair competition claims brought under the Lanham Act, 15 U.S.C. § 1051 *et seq*. So, the Court focuses on those claims as well.

Likelihood of confusion is the hallmark of any mark infringement claim; it's necessary to prevail on claims for mark infringement under § 1114(1) and unfair competition under § 1125(a). *Minn. Min. & Mfg. Co. v. Rauh Rubber, Inc.*, 130 F.3d 1305, 1308 (8th Cir. 1997); *see also A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 n.5 (3d Cir. 2000). To prevail

on a claim of mark infringement under § 1114(1), plaintiffs must establish that they own a valid, protectable mark and that there is a likelihood of confusion between their mark and the defendant's mark. *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 569 F.3d 383, 389 (8th Cir. 2009).

Similarly, § 1125(a)(1), which offers protection to marks regardless of federal registration, prohibits the use of a mark in connection with goods or services in a manner likely to cause confusion as to the source or sponsorship of the goods or services. § 1125(a)(1); *see also Davis v. Walt Disney Co.*, 430 F.3d 901, 903 (8th Cir. 2005). In essence, on the present facts, the elements for a claim of infringement and a claim for unfair competition are identical. *See, e.g.*, *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1219 (10th Cir. 2004); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1288 n.2. (9th Cir. 1992).

Before preliminary injunctive relief is warranted, a markholder must show a probability of confusion, not merely a possibility—there must be a substantial likelihood that the public will be confused. *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 950 (8th Cir. 2023). The Court must consider several nonexclusive, nonexhaustive factors to assess likelihood of confusion, which include: (a) the strength of the owner's mark; (b) the similarity of the owner's mark and the alleged infringer's mark; (c) the degree to which the products compete with each other; (d) the alleged infringer's intent to "pass off" its goods as those of the trademark owner; (e) incidents of actual confusion; and (f) the type of product, its cost, and conditions of purchase. *Id*. at 947.

(a) Strength of Mark

A strong and distinctive mark is entitled to greater protection than a weak or commonplace one. *Id*. Two relevant measurements of a mark's strength are its conceptual strength and its commercial strength. *ZW USA, Inc. v. PWD Sys., LLC*, 889 F.3d 441, 446 (8th Cir. 2018). The plaintiff argues

that its mark is suggestive—that is, that it requires imagination, thought, and perception to reach a conclusion as to the nature of the goods. *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139, 1147 (8th Cir. 2011). The Court isn't entirely persuaded—rather, on the Court's preliminary view, it seems fairer to characterize "SAV-RX" as a merely descriptive mark.

The test for descriptiveness is what consumers understand the term to be. *Id*. A term is descriptive if it conveys an immediate idea of the ingredients, qualities or characteristics of the goods. *Frosty Treats Inc. v. Sony Computer Ent. Am. Inc.*, 426 F.3d 1001, 1005 (8th Cir. 2005). And here, "Rx" is well-understood to be an abbreviation for a medical prescription. "Rx," Wikipedia, https://en.wikipedia.org/wiki/Rx (last visited Dec. 6, 2023). "SAV" is little more than a misspelling of "save." *See ZW USA, Inc.*, 889 F.3d at 446. In other words, the plaintiff offers savings on prescription drugs, and "Sav-Rx" "conveys an immediate idea of the qualities and characteristics" of that service. *See Frosty Treats*, 426 F.3d at 1005. "No imagination, thought, or perception is required to reach a conclusion as to the nature of its [services]." *Id*.

If "SAV-RX" is, indeed, ultimately found to be a descriptive mark, then the plaintiff will need to show secondary meaning to prevail. *Id*. Secondary meaning is an association formed in the minds of consumers between the mark and the source or origin of the product, and to establish it, the plaintiff must show that "SAV-RX" serves to identify its goods and distinguish them from those of others. *Id*. Secondary meaning doesn't require the consumer to identify a source by name but does require that the public recognize the mark and associate it with a single source. *Id*.

And here, there's nothing in the record—at this point—to establish secondary meaning. There is, in fact, little information about consumers at all, or what they actually think. For instance, the plaintiff asserts that it has a

network "of more than 72,000 pharmacies"—but that tells the Court nothing about how many people actually *use* the plaintiff's service. And that assumes that *users* of the service are even the relevant audience. There is also little in the record about how the plaintiff actually makes a profit—and it may well be that the entities that actually *pay* the plaintiff are the more relevant audience for purposes of determining consumer confusion.

In sum, while the Court finds that this factor weighs to some extent in favor of the plaintiff, that weight is limited.

### (b) Similarity of Marks

The Court agrees with the plaintiff that this factor weighs in its favor, based on the apparent similarity between the marks.

### (c) Degree of Competition

The Court also agrees with the plaintiff that this factor weighs in its favor, given the evidence that the parties provide directly overlapping services. *See H&R Block*, 58 F.4th at 948-49.

### (d) Infringer's Intent

There's no evidence at this point that the defendant intends to cause consumer confusion—this factor does not favor the plaintiff. *See id*. at 949.

### (e) Incidents of Actual Confusion

There's also no evidence at this point of actual confusion—accordingly, this factor doesn't favor the plaintiff either. *See id*.

(f) Type of Product

The final factor examines the conditions of purchase and the degree of care expected of customers. *Sensient Techs. Corp. v. SensoryEffects Flavor Co., 613 F.3d 754, 769 (8th Cir. 2010)*. In considering this factor, the Court must stand in the shoes of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods. *Id*. This factor is more important in confusion-of-source cases where the degree of care the purchaser exercises in purchasing a product can eliminate confusion that might otherwise exist. *Id*.

The plaintiff argues that customers of discount pharmaceuticals are likely to be confused. Filing 5 at 10. Fair enough. But as noted above, it's not entirely obvious that the people using the plaintiff's discount cards to get their prescriptions are the relevant "ordinary purchaser," because it appears they don't actually *purchase* the plaintiff's service. Are the "consumers" the people who *use* the plaintiff's service, or the people who *pay* the plaintiff?

That's somewhat relevant to irreparable harm, as explained below—but it's also relevant here, because the people whose potential confusion matters have to be the people whose purchasing decisions drive the plaintiff's business. Perhaps they are ordinary consumers of prescription drugs—perhaps there is a linear relationship between the number of people who use the plaintiff's discount cards and the plaintiff's bottom line. But the record before the Court doesn't clearly establish that relationship.

(g) Balancing of Factors

On balance, the plaintiff has at least shown a possibility of consumer confusion, and its corresponding possibility of success on the merits. The degree of similarity between the parties' marks, for essentially the same services, gets the plaintiff that far. A *probability* of confusion, *see H&R Block,*

58 F.4th at 950, is more debatable. Particularly given the Court's questions about the strength of the plaintiff's mark, and about the conditions of purchase and the degree of care expected of customers—whoever those customers might be—the Court finds it difficult to conclude at this point that the plaintiff has shown a *likelihood* of success on the merits.

### 2. IRREPARABLE HARM

A temporary restraining order cannot issue without a showing of irreparable harm. *Dataphase*, 640 F.2d at 114 n.9. To show a threat of irreparable harm, the movant must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief. *Roudachevski*, 648 F.3d at 706. Stated differently, the harm "must be actual and not theoretical." *Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986). And harm is not irreparable when a party can be fully compensated for its injuries through an award of damages. *Gen. Motors Corp. v. Harry Brown's, LLC,* 563 F.3d 312, 319 (8th Cir. 2009). But a markholder seeking preliminary injunctive relief under the Lanham Act is entitled to a rebuttable presumption of irreparable harm upon a finding of likelihood of success on the merits. § 1116(a); *see also H&R Block*, 58 F.4th at 951.

Of course, that presumption doesn't help the plaintiff when the Court is not yet convinced of its likelihood of succeeding on the merits. The plaintiff's argument for irreparable harm rests entirely on that presumption, so it's provided the Court with no other argument or evidence showing harm, irreparable or otherwise. And as implied above, the Court has other questions: How, exactly, does the allegedly unfair competition from the defendants actually affect the plaintiff's bottom line? The Court is simply not in a position, at this point, to conclude that the plaintiff has shown irreparable injury is

*likely* in the absence of an injunction. *See Winter v. Nat. Res. Defense Council, Inc.,* 555 U.S. 7, 22 (2008).

### 3. BALANCE OF HARMS

The Court must also consider the balance of harms between the parties. *See Dataphase,* 640 F.2d at 114. Because a temporary restraining order is an extraordinary remedy never awarded as of right, the Court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Winter,* 555 U.S. at 24.

The Court is ill-positioned to balance the harms between the parties with little to tell it what the harms to the plaintiff are. (Which would be true even if the plaintiff established a statutory presumption of irreparable harm, which is difficult to weigh against anything else.) Instead, the plaintiff simply asserts that the defendant wouldn't be harmed by injunctive relief because it's a wrongdoer. Filing 5 at 11. But whether the defendant is a wrongdoer is yet to be proven—and, in fact, it's well-established that the burden on a movant to demonstrate that an injunction is warranted is heavier when granting the injunction will in effect give the movant substantially the relief it would obtain after a trial on the merits. *Rathmann Grp. v. Tanenbaum,* 889 F.2d 787, 789-90 (8th Cir. 1989); *see also Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.,* 997 F.2d 484, 490 (8th Cir. 1993).

The plaintiff's bare contention that the defendant wouldn't be harmed is undercut by the broad and arguably mandatory nature of the relief it requests, which includes prohibiting use of the "SaveRx" mark and ordering the defendant and "all pharmacies, retailers, and other individuals and establishments wherever located in the United States or Puerto Rico that advertise or promote Defendant's services" to stop using the "SaveRx" mark

and immediately remove any promotional materials bearing that mark from public view. Filing 4 at 2-4.

It's hard to see how that wouldn't impact the defendant. In addition, the primary function of a preliminary injunction is to preserve the status quo until, upon final hearing, a court may grant full, effective relief. *Rathmann*, 889 F.2d at 789-90; *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir. 1984). So, courts have applied more stringent requirements to the granting of a mandatory preliminary injunction than a prohibitory preliminary injunction. *Id.*; *cf. Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 486 (8th Cir. 1993). Because a mandatory injunction requires the Court to command the defendant to take a particular action, mandatory preliminary writs are ordinarily viewed cautiously and issued sparingly. *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997).

Here, the relief requested by the plaintiff clearly commands the defendant—and thousands of presumably innocent third parties—to act. The implications of that request give the Court pause. For instance, what if those third parties have contractual obligations to the defendant that would be implicated by compliance with the Court's order? Does the Court—or the defendant—have the authority or ability to control them? *Cf. Kuper Indus., LLC v. Reid*, 89 F. Supp. 3d 1005, 1014 (D. Neb. 2015). It's also hard to imagine how the Court could effectively enforce such an order against all those pharmacies and retailers—and this Court isn't in the habit of issuing orders it has no ready way to enforce.

Admittedly, the line between "stop using the plaintiff's mark" and "do something to remove materials that use the plaintiff's mark" is a thin one, and the Court certainly isn't ruling out injunctive relief to that effect. But it's a more serious undertaking than the plaintiff's argument would suggest.

#### 4. PUBLIC INTEREST

Next, the Court must consider the public interest. *See Dataphase*, 640 F.2d at 114. The Court agrees with the plaintiff that there is a public interest in enforcing valid marks and preventing consumer confusion. *See Kuper Indus.*, 89 F. Supp. 2d at 1014. That said, there are people who presumably depend on the defendant's service to obtain affordable prescription drugs, and the Court is concerned about the effect that any potential injunctive relief would have on them. The Court recognizes that sometimes, causing consumer confusion in the short term may be needed to correct it in the long term—but that's not something the Court is going to rush into.

#### 5. *EX PARTE* RELIEF

Finally, beyond the *Dataphase* factors, the Court also considers the need for the emergency *ex parte* relief afforded by a temporary restraining order. The record does not establish that this situation is an emergency. The Court notes that the plaintiff's demand letter was sent on October 10, 2023, and provided the defendant with three weeks to respond. Filing 1-9. And after that deadline elapsed, it was another full month before this case was filed. Filing 1.

The Court isn't accusing the plaintiff of sleeping on its rights. *See, e.g.*, *Phyllis Schlafly Revocable Tr. v. Cori*, 924 F.3d 1004, 1009 (8th Cir. 2019); *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 889 (8th Cir. 2013). The Court is simply saying that having waited nearly two months after sending a demand letter to file a lawsuit, the plaintiff can wait a little longer to at least give the defendant an opportunity to be heard on this motion.

### III. CONCLUSION

As explained above, the Court finds that the plaintiff has not met the heavy burden of proving its entitlement to a temporary restraining order. The

Court will, however, expeditiously consider whether preliminary injunctive relief is warranted. Nothing in this order should be read to suggest that the Court is not strongly considering an award of preliminary injunctive relief, particularly should the plaintiff address the Court's concerns—the defendant's compliance with the provisions below is *not* optional.

IT IS ORDERED:

1. The plaintiff's request for a temporary restraining order is denied.

2. The defendant shall respond to the plaintiff's motion for preliminary injunction (filing 4) on or before December 14, 2023.

3. The plaintiff may reply in support of its motion on or before December 21, 2023.

4. A hearing on the plaintiff's motion for preliminary injunction (filing 4) is set for December 22, 2023 at 10:00 a.m. in Courtroom 1, Robert V. Denney Federal Building and U.S. Courthouse, 100 Centennial Mall North, Lincoln Nebraska.

5. The parties shall inform the Court on or before December 15, 2023, whether they anticipate presenting additional evidence at the hearing and whether they intend to appear live or remotely.

6. The plaintiff is directed to provide the defendant with effective service of this order by the most efficient available means.

Dated this 8th day of December, 2023.

BY THE COURT:

*John M. Gerrard*
John M. Gerrard
Senior United States District Judge

- 13 -